UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Dolores Stegelin, Wayne Gugel, and Anne H. Rack, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:21-cv-01444-BHH |
| v. | ) ) | |
| Pacific Life Insurance Company, | ) ) | **Opinion and Order** |
| Defendant. | ) ) ) | |

This matter is before the Court on Defendant Pacific Life Insurance Company's ("Pacific Life") motion to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (ECF No. 22.) For the reasons set forth in this Order, the motion is granted.

## BACKGROUND

Plaintiffs Dolores Stegelin, Wayne Gugel, and Anne H. Rack (collectively "Plaintiffs") originally filed this action in state court on January 25, 2019, against: Chris Dixon ("Dixon") and Black Harbor Wealth Management, LLC; Faw Casson & Co., LLP; Shurwest LLC ("Shurwest"); Agee, Fisher, Barret, LLC; MJSM Financial, LLC; and Melanie Schulze-Miller. (ECF No. 1-1 at 4–24.) The action related to Dixon's recommendation that Plaintiffs participate in a retirement planning strategy known as the "Life Insurance Retirement Strategy." (*See id.*) Pacific Life was not a party to that action.

On February 25, 2019, Plaintiffs filed an amended complaint against the defendants listed above, and added defendants Securian Financial Group, Inc.,

---

[1] Defendant Shurwest LLC was dismissed from this action on March 7, 2022, by way of a stipulation of dismissal without prejudice. (ECF No. 51.)

Minnesota Life Insurance Company, and Minnesota Mutual Companies, Inc. (*Id.* at 35–63.) Pacific Life was not named in the amended complaint.

On April 7, 2021, Plaintiffs filed a motion to amend and for leave to file second amended complaint ("Motion to Amend"). (ECF No. 1-16 at 37–38.) The proposed second amended complaint ("SAC"), which was attached to the Motion to Amend, re-captioned the lawsuit by eliminating all of the defendants named in the complaint and amended complaint, with the exception of Shurwest, and added Pacific Life to the suit. (*Id.* at 39–80.) The state court never ruled on Plaintiffs' Motion to Amend, but Plaintiffs separately filed the SAC on the state court docket the same day that they filed the Motion to Amend itself. (*Id.* at 86–126.) Plaintiffs then served Pacific Life with the SAC and Pacific Life removed the case to this Court on May 13, 2021. (ECF No. 1.)

The claims asserted in the SAC arise out of Plaintiffs' participation in the "IRA Reboot Program," which was recommended to them by their financial advisor, Dixon of Black Harbor Wealth Management, LLC. (*See* SAC Introduction.) The SAC asserts that the IRA Reboot Program was a marketing and sales program wherein Dixon, as motivated by Shurwest and its agents, "recommended that Plaintiffs employ a strategy for creating 'tax-free' retirement income by using existing assets to establish and fund Indexed Universal Life ('IUL') insurance policies (the 'IRA Reboot')." (*Id.*) The SAC further asserts that "[t]hese policies were not suitable for Plaintiffs, given their specific financial situations and retirement goals." (*Id.*)

**The IRA Reboot Program**

According to the SAC, the IRA Reboot Program was "created, promoted, and implemented" by Shurwest and its agents. (SAC ¶ 15.) Shurwest is an independent

marketing organization that markets, distributes, and advises insurance agents and investment advisors on the sale of insurance products. (*Id.* ¶ 4.) Shurwest allegedly maintained a nationwide network of financial advisors and agents, which it educated and trained to promote and sell the IRA Reboot Program to their clients as part of their retirement and financial planning strategies. (*Id.* ¶¶ 16–18.) The SAC alleges that Dixon was one of Shurwest's network agents. (*Id.* ¶ 19.) Shurwest allegedly educated and trained Dixon on the IRA Reboot Program, and helped him to promote and sell the program to his clients, including Plaintiffs. (*Id.*)

The SAC states that the IRA Reboot Program worked in multiple steps, each controlled by Shurwest. (*Id.* ¶¶ 18, 23.) First, Shurwest and Dixon recommended that Plaintiffs liquidate existing savings, retirement accounts, or home equity to cash. (*Id.* ¶ 23.) Next, Shurwest and Dixon advised Plaintiffs to use the liquidated funds to purchase IUL life insurance policies as part of the new retirement and financial planning strategy. (*Id.*) Shurwest and Dixon allegedly represented that the IUL life insurance policies would not only provide a death benefit, but also accumulate cash value that Plaintiffs could borrow against to supplement their retirement income on a tax-free basis. (*Id.* ¶¶ 25, 27–28, 30.) Shurwest and Dixon further represented that the IRA Reboot Program was a sound retirement and financial planning strategy. (*Id.* ¶ 29.)

**The Structured Cash Flow Products**

As part of the IRA Reboot Program, Shurwest and Dixon also allegedly recommended that Plaintiffs purchase a structured cash flow product sold by Future Income Payments, LLC ("FIP") as a funding mechanism that would allow Plaintiffs to fund the life insurance policies faster and at higher levels. (*Id.* ¶¶ 36, 56.) According to the

SAC, FIP would acquire the rights to future income payments from individual pensioners and offer them up-front, lump-sum payments in exchange for the rights to receive a portion of their monthly pension payment for a specific term. (*Id.* ¶ 57.) Purchasers like Plaintiffs would then pay FIP to establish structured cash flow payments that would provide a return of the purchase price plus a specified rate of return in equal monthly payments of a multi-year term. (*See id.* ¶¶ 62–64.) Shurwest allegedly designed the IRA Reboot Program so that Plaintiffs would use the income stream from the FIP structured cash flow products to pay the premiums for their IUL insurance policies. (*Id.* ¶ 60.) Shurwest and Dixon allegedly represented that FIP was a reputable and legitimate operation, and that the money they invested in the structured cash flow products would be safe and secure. (*Id.* ¶¶ 40–41.)

As a result of Shurwest and Dixon's representations, Plaintiffs allege that they established structured cash flow products with FIP using existing savings, with the expectation that they would receive a return of the purchase price plus a specified rate of return in equal monthly payments over a period of several years. (*Id.* ¶¶ 62–64.) Plaintiffs intended to use the income streams from the cash flow products to fund their IUL insurance policies, as recommended by Shurwest and Dixon. (*Id.* ¶ 65.)

Starting in January 2015, FIP became the subject of regulatory investigations, resulting in a number of cease and desist orders, consent orders, and lawsuits in more than thirteen states across the country. (*Id.* ¶ 66.) As a result of these regulatory actions, FIP stopped collecting payments from pensioners, which shut off the revenue stream needed to make payments to the structured cash flow products owned by purchasers, including Plaintiffs. (*Id.* ¶ 67.) In or around April 2018, FIP allegedly provided notice to

Dixon that it would stop collecting payments from pensioners and distributing those payments to structured cash flow investors like Plaintiffs. (*Id.* ¶ 69.) Plaintiffs subsequently learned from Dixon that FIP could no longer meet its obligations and that payments from their structured cash flow products would stop. (*Id.*) According to the SAC, "[t]his was the first notice to Plaintiffs that the IRA Reboot Program was flawed and the first indication they had that they had suffered a financial loss by participating in that strategy." (*Id.*) The SAC states that FIP was later revealed to be an illegal Ponzi scheme that was orchestrated by a previously convicted felon, and notes that FIP and its principals have since been indicted by the Department of Justice for their roles in running a Ponzi scheme.[2] (*Id.* ¶ 72.)

When the payments stopped in April 2018, Plaintiffs were allegedly deprived of the income stream they had been using to pay their insurance premiums. (*Id.* ¶ 70.) Plaintiffs also lost the balance of their investments with FIP. (*Id.*) The SAC asserts that, without the monthly payments from the structured cash flow products, Plaintiffs were required to pay the insurance premiums out of pocket or risk the policies lapsing. (*Id.* ¶ 71.) When FIP collapsed, Plaintiffs allegedly lost the retirement savings that they had invested in FIP and the structured cash flow products. (*Id.* ¶ 74.)

The SAC alleges that using structured cash flow products as a means to fund Plaintiffs' IUL policies subjected Plaintiffs to unnecessary and inappropriate risks. (*Id.* ¶ 73.) Plaintiffs contend these risks should have prevented Shurwest from incorporating FIP structured cash flow products into the design of the IRA Reboot Program and should have prevented Shurwest and Dixon from recommending that strategy as a safe and

---

[2] The related criminal case, *United States v. Kohn, et al.*, No. 6:19-cr-239-BHH (D.S.C.), is pending before the undersigned.

sound retirement plan. (*Id.*)

**The Pacific Life Discovery Xelerator (PDX) Insurance Policy**

According to the SAC, the IRA Reboot Program that Plaintiff Wayne Gugel ("Gugel") participated in utilized a Pacific Life insurance policy known as the Pacific Life Discovery Xelerator (the "Policy").[3] (*See* ECF No. 22-2.) The Policy is a type of cash value life insurance known as universal life insurance, and states that it is a "Flexible Premium Indexed Adjustable Life Insurance" policy. (*Id.* at 2.) The Policy has cash accumulation features and options for allocating to accounts that credit interest if there is a positive performance in an outside index, like the S&P 500. (*Id.* at 50 ("This is a flexible premium adjustable life insurance policy with an optional feature linking interest to an outside index.").) The Policy allows the owner to "allocate all or a portion of your Policy's Accumulated Value to one or more policy accounts, each referred to as an 'Indexed Account,' for which values will vary over time, based in part, on the change in value of the external index ('Index')." (*Id.* at 59.) In other words, interest is credited to an Indexed Account based on the performance of the stock market index to which it is linked, subject to certain limits. (*See id.* at 59–61.) Policyowners also have the option of leaving their Accumulated Value in the fixed account, which earns a minimum guaranteed interest rate. (*Id.* at 59.) One Policy feature is the "Performance Factor"—a bonus in the form of a multiplier that *can* increase the credited interest rate in an Indexed Account. (*Id.* at 27–28

---

[3] In deciding a motion to dismiss, a court may consider documents "integral to and explicitly relied on in the complaint" provided the non-moving party does not challenge the documents' authenticity. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *see also Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering investment reports attached to motion to dismiss because complaint relied on the reports and plaintiffs did not challenge the reports' authenticity). Here, the Policy and Policy Illustrations are documents that are integral to and explicitly referenced throughout the SAC. (*See, e.g.*, SAC ¶¶ 96–104, 148–50.) Indeed, these documents form the basis of Gugel's claims against Pacific Life, and their authenticity cannot be disputed. Accordingly, the Court has considered these documents, which are attached to Pacific Life's motion to dismiss. (ECF Nos. 22-2, 22-3, 22-4.)

(stating the Performance Factor is "the factor used to determine" the final interest rate each year and is guaranteed to be at least 1.00).) The Performance Factor is discretionary and is determined by Pacific Life based on factors stated in the Policy. (*Id.* at 28; *see* ECF No. 22-3 at 16 (itemizing non-exhaustive set of factors used to determine Performance Factor).)

During the sales process, Pacific Life provides prospective purchasers with policy illustrations, which give information about a policy and its potential future performance. (*See* January 17 and March 6, 2018 Policy Illustrations (the "Illustrations"), ECF Nos. 22-3 & 22-4.)[4] Here, the Illustrations note in bold on the cover page: "Pacific Life is a product provider. It is not a fiduciary and therefore does not give advice or make recommendations regarding insurance or investment products." (ECF No. 22-3 at 2.) The Illustrations contain a number of scenarios regarding how the Policy may perform over time given the application of certain guaranteed and non-guaranteed assumptions. The Illustrations explain how Pacific Life calculates the "Hypothetical Indexed Interest Rate" for the Illustrations based on historical index returns, and notes that "[t]his is not an indication of future performance and is not guaranteed." (*Id.* at 11.) In a section titled "Important Information," the Illustrations state in bold: "This is an illustration only. An illustration is not intended to predict actual performance. Interest rates, dividends, or values that are set forth in the illustration are not guaranteed, except for those items clearly labeled as guaranteed." (*Id.* at 8.) In the "Non-Guaranteed Assumptions" section, the Illustrations state:

> Values shown in this illustration are based on non-guaranteed policy charges and non-guaranteed crediting rates. Over time, the policy's actual

---

[4] The Illustrations contain identical disclosures. For ease of reference, citations to the Illustrations will refer to the January 17, 2018 Illustration (ECF No. 22-3).

non-guaranteed elements, and perhaps your actual use of the policy's options, are likely to vary from the assumptions used in this illustration. For these reasons, actual policy values will either be more or less favorable than shown in this illustration.

Non-guaranteed/current elements are not guaranteed by definition. As such, Pacific Life Insurance Company reserves the right to change or modify any of these elements. This right to change these elements is not limited to a specific time or reason.

(*Id.*) In a section titled "Illustrated Indexed Account Performance Factor," the Illustrations state:

The illustrated account values reflect each segment's Segment Indexed Interest, which is applied to the segments at each Segment Maturity. One of the segment components, the Performance Factor, is used to determine the Segment Indexed Interest. The Performance Factor is determined for each segment at the segment start date based upon certain factors, including but not limited to: the face amount, the policy's Accumulated Value, and which Indexed Account the segment is allocated to. The Performance Factor may vary by segments, but will never be less than the Guaranteed Minimum Performance Factor for the Segment Term, as shown in the Indexed Account sections found in the Narrative Summary. *A Performance Factor greater than the Guaranteed Minimum Performance Factor for an Indexed Account will increase the Segment Indexed Interest as reflected in this illustration, but is not guaranteed. This illustration reflects Performance Factors greater than the minimum beginning with segments created in policy year 3 and until age 121.*

(*Id.* at 16 (emphasis added).)

The SAC does not provide any detail specific to Gugel's purchase of the Policy; that is, it does not include any allegations discussing Gugel's experience with the sales process, his specific interactions with Dixon or Pacific Life, his decision to purchase the Policy, or what he relied upon in making that decision. (*See* ECF No. 1-16 at 86–126.) Nevertheless, the SAC suggests that Gugel was induced to purchase the Policy based on alleged misrepresentations or omissions in the Illustrations regarding how the Policy might perform in the future. (SAC ¶¶ 98–100, 148–50.) In general, the allegations suggest

that the Illustrations Gugel received fail to adequately explain the operation of the Performance Factor, how it was calculated, or how it affects the non-guaranteed values shown in the Illustrations. (*See id.*) Based on the foregoing, Gugel asserts claims against Pacific Life for aiding and abetting breach of fiduciary duty (*id.* ¶¶ 132–37 (Third Cause of Action)) and negligent misrepresentation (*id.* ¶¶ 146–59 (Fifth Cause of Action)).

Pacific Life filed its motion to dismiss for failure to state a claim upon which relief can be granted on June 10, 2021. (ECF No. 22.) The motion is fully briefed, the matter is ripe for disposition, and the Court now issues the following ruling.

## **LEGAL STANDARD**

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint, considered with the assumption that the facts alleged are true." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (internal citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556)). Although the allegations in a complaint generally must be accepted as true, that principle "is inapplicable to legal conclusions," and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citations and quotation marks omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads

facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Still, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010).

## DISCUSSION

### I.    Viability of the Second Amended Complaint

In its first argument for dismissal, Pacific Life claims that the SAC is a legal nullity because Plaintiffs were never authorized to file it. (ECF No. 22-1 at 14–15.) Rule 15(a) of the South Carolina Rules of Civil Procedure provides that:

> A party may amend his pleading once as a matter of course at any time before or within 30 days after a responsive pleading is served or, if the pleading is one to which no responsive pleading is required and the action has not been placed upon the trial roster, he may so amend it at any time within 30 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires and does not prejudice any other party.

S.C. R. Civ. P. 15(a). "This rule strongly favors amendments and the court is encouraged to freely grant leave to amend." *Parker v. Spartanburg Sanitary Sewer Dist.*, 607 S.E.2d 711, 717 (S.C. Ct. App. 2005) (citing *Jarell v. Seaboard Sys. R.R.*, 363 S.E.2d 398 (S.C.

10

Ct. App. 1987)). Prior to removal, no party opposed Plaintiffs' Motion to Amend or provided any indication that it would be prejudiced by the amended pleading. Likewise, no party has done so since the case was removed. Pacific Life does not argue in its motion to dismiss that it has been prejudiced by the SAC. (*See* ECF No. 22-1.) The fact that the state court never ruled on the Motion to Amend appears to be owing to the fact that Pacific Life removed the case to this Court shortly after the Motion to Amend was filed—approximately one month. It goes without saying that Plaintiffs should have waited until the Motion to Amend was granted before separately filing the SAC. However, where no prejudice has been articulated, there is little doubt that the state court would have granted Plaintiffs' Motion to Amend had the case not been removed. In keeping with courts' strong preference for resolving disputes on their merits, *see United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993); *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980); *United States v. Mraz*, 274 F. Supp. 2d 750, 756 (D. Md. 2003); *Malla v. Rajamani*, No. 1:08CV1319 (JCC), 2009 WL 928689, at *1 (E.D. Va. Apr. 1, 2009), the Court finds that it is appropriate to overlook the technical issue of leave not having been granted and to proceed to consider the legal sufficiency of the SAC. Accordingly, dismissal based on Pacific Life's assertion that the SAC is a legal nullity is denied.

## II.    Statute of Limitations

Pacific Life next argues that Gugel's claims should be dismissed because they are barred by South Carolina's three-year statute of limitations that applies to an action alleging "any injury to the person or rights of another, not arising on contract and not enumerated by law." S.C. Code § 15-3-530(5); (*see* ECF No. 22-1 at 15–18.) It is well

settled that the three-year limitations period begins to run "'after the person knew or by the exercise of reasonable diligence *should have known* that he [or she] had a cause of action.'" *Walbeck v. I'On Co., LLC*, 827 S.E.2d 348, 361 (S.C. Ct. App. 2019) (citation and quotation marks omitted; emphasis and modifications in original) (applying three-year statute of limitations to negligent misrepresentation claims). "The 'exercise of reasonable diligence' means 'the injured party must act with some promptness [when] the facts and circumstances of an injury place a reasonable person of common knowledge and experience on *notice* that a claim against another party *might* exist.'" *Id.* (quoting *Dean v. Ruscon Corp.*, 468 S.E.2d 645, 647 (S.C. 1996)) (emphasis and modifications in original). "In other words, the discovery rule does not 'require absolute certainty [that] a cause of action exists before the statute of limitations begins to run.'" *Id.* (quoting *Bayle v. S.C. Dep't of Transp.*, 542 S.E.2d 736, 741 (S.C. Ct. App. 2001)) (modifications in original).

The Court finds that Gugel's claims are not time-barred by the statute of limitations. Reading the SAC in the light most favorable to Plaintiffs, Gugel did not discover the basis for his claims until after FIP collapsed in April 2018. According to the SAC, after FIP failed, Gugel learned of its collapse, the impact that collapse had on his FIP investment, and its broader impact on the viability of the IRA Reboot strategy recommended by Dixon. (SAC ¶ 69.) Gugel has asserted two claims against Pacific Life—aiding and abetting the breach of a fiduciary duty and negligent misrepresentation. (*Id.* at ¶¶ 132–137, ¶¶ 146–159.)

First, as to the negligent misrepresentation claim, Pacific Life's arguments for dismissal overlook the fact that Gugel had not suffered any financial losses prior to FIP's collapse in April 2018. To state a valid claim for negligent misrepresentation, a plaintiff must establish:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation.

*Quail Hill, LLC v. Cty. of Richland*, 692 S.E.2d 499, 508 (S.C. 2010). The SAC alleges that, under the IRA Reboot strategy promulgated by Shurwest and Dixon, the monthly payments from Plaintiffs' FIP investments were used to fund the IUL premiums. Construing the allegations in Gugel's favor, he could not have satisfied the sixth and final element of a negligent misrepresentation claim until FIP collapsed in April 2018. At that point, Gugel would have realized his remaining FIP investment was lost, along with his ability to fund the ongoing IUL premiums with the monthly income stream from FIP, which allegedly caused further losses.

This analysis is in keeping with the discovery rule, enumerated above, under which rule a limitations period commences "when the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some claim against another party might exist." *Allwin v. Russ Cooper Assoc., Inc.*, 825 S.E.2d 707, 713 (S.C Ct. App. 2019) (quoting *Stokes-Craven Holding Corp. v. Robinson*, 787 S.E.2d 485, 489 (S.C. 2016)). Reading the SAC in the light most favorable to Plaintiffs, Gugel had no reason to suspect he had received negligent investment advice or suffered damages until he realized that his FIP investment would not produce the promised payments he relied on to pay IUL premiums. As already stated, that did not occur until after FIP collapsed in April 2018. He then brought his claims against Pacific Life within three years (April 7, 2021) and as such, his negligent misrepresentation is timely.

13

The same logic applies to Gugel's claim against Pacific Life for aiding and abetting the breach of a fiduciary duty. If, as alleged in the SAC, the April 2018 stoppage of FIP payments "was the first notice to Plaintiffs that the IRA Reboot Program was flawed and the first indication . . . that they had suffered a financial loss by participating in that strategy" (SAC ¶ 69), then Gugel's filing of his aiding and abetting claim against Pacific Life in April 2021 was timely. Therefore, dismissal based on Pacific Life's assertion that Gugel's claims are time-barred is denied.

## III.    Particularity Requirements of Rule 9(b)

Pacific Life's next theory of dismissal asserts that Gugel's negligent misrepresentation claim sounds in fraud and thus requires the Court to apply the heightened pleading standard of Federal Rule of Civil Procedure 9(b). (*See* ECF No. 22 at 18–23.) This argument is unavailing. In *Baltimore Cty. v. Cigna Healthcare*, 238 F. App'x 914 (4th Cir. 2007), the plaintiff asserted claims for fraud in the inducement, negligent misrepresentation, and breach of contract against several defendants. *Id.* at 918. On appeal, and in the context of a fraudulent joinder analysis, a defendant argued that the district court correctly applied the pleading requirements of Rule (b) to the negligent misrepresentation claim. *Id.* at 921. The Fourth Circuit disagreed and stated that "[i]n evaluating whether a cause of action must be pled with particularity, a court should examine whether the claim requires an essential showing of fraud," even if the cause of action is not itself named as a fraud claim. *Id.* (citations omitted). The Court reviewed the elements of negligent misrepresentation under Maryland law, concluded that fraud was not an essential component of any of those elements, and therefore held that Rule 9(b)'s heightened pleading standard did not apply to the negligent

14

misrepresentation claim. *Id.*; *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1104–05 (9th Cir. 2003) ("Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."); *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) ("[A] pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure.").

Likewise, this Court finds that the heightened pleading standard embodied in Rule 9(b) does not apply to a negligent misrepresentation claim under South Carolina law. *See Smith v. Nationstar Mortgage, LLC*, 2015 WL 13759742, *3 (D.S.C. 2015) (relying on *Baltimore Cty. v. Cigna* and finding "no meaningful difference" between the elements of a negligent misrepresentation claim under Maryland law and South Carolina law). Fraud is not an essential component of any element to a cause of action for negligent misrepresentation in South Carolina. (*See supra* at 13 (listing elements).) Accordingly, dismissal of Gugel's negligent misrepresentation claim on the basis that it fails Rule 9(b)'s pleading requirements is denied.

## IV. Viability of Gugel's Claims Against Pacific Life as a Matter of Law

### A. Claim for Aiding and Abetting the Breach of a Fiduciary Duty

"The elements for a cause of action of aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages." *Vortex Sports & Ent., Inc. v. Ware*, 662 S.E.2d 444, 448 (S.C. 2008). "The gravamen of the claim is the defendant's knowing participation in the fiduciary's breach." *Future Group, II v. Nationsbank*, 478 S.E.2d 45,

15

50 (S.C. 1996). The Court finds that Gugel's claim for aiding and abetting the breach of a fiduciary duty fails because it does not plausibly allege that Pacific Life knowingly participated in the alleged fiduciary breach.

As an initial matter, it is not entirely clear that the SAC adequately alleges the existence of a fiduciary relationship between Dixon and Gugel. Under South Carolina law, a "fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d 502, 507 (S.C. Ct. App. 2002) (citation and quotation marks omitted); *see also Burwell v. South Carolina Nat'l Bank*, 340 S.E.2d 786, 790 (S.C. 1986) ("As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a [fiduciary] relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interest of the other party."). "As a general rule, a fiduciary relationship cannot be established by the unilateral action of one party." *Regions Bank v. Schmauch*, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003) (citations omitted). "The other party must have actually accepted or induced the confidence placed in him." *Id.*

The SAC alleges that "Dixon provided retirement and financial planning advice to clients" and that he "recommended insurance products as part of the retirement and financial planning advice [he] provided to clients, including Plaintiffs." (SAC ¶ 14.) It further alleges that Dixon:

   • recommended that Plaintiffs liquidate their more traditional, existing savings (often 401(k) and IRA accounts) or convert home equity to cash,

16

and that Shurwest and Dixon advised Plaintiffs to use their liquidated and re-positioned funds to purchase expensive, complex indexed universal life insurance policies ("IUL") as part of their retirement and financial planning strategy (*Id.* ¶ 23);

• represented to Plaintiffs that the IUL policies would provide Plaintiffs with a death benefit and would also accumulate cash value that Plaintiffs could borrow against in retirement to supplement their income (*Id.* ¶ 30);

• represented to Plaintiffs that the IRA Reboot Program was a legitimate and sound retirement and financial planning strategy (*Id.* ¶ 31);

• advised Plaintiffs to use the third-party funding mechanisms to fully fund their universal life insurance policies faster and at higher levels (*Id.* ¶ 39);

• represented to Plaintiffs that the third parties administering the funds were reputable and legitimate operations that could be trusted (*Id.* ¶ 40);

• represented to Plaintiffs that the money they invested with the third parties administering the funding mechanisms would be safe and secure (*Id.* ¶ 41);

• represented that making IUL premium payments for only a set amount of time would result in tax-free income for life (Id. ¶ 76.)

The SAC states that based on Dixon's advice, recommendations, and representations, Plaintiffs "participated in the IRA Reboot Program" and "purchased FIP structured cash flow products in conjunction with their purchases of IUL policies." (*Id.* ¶¶ 43, 61.) These allegations paint a picture in which Dixon was both in a position to provide and did in fact provide advice and counsel to Plaintiffs regarding their financial investments. *See Consol. Insured Benefits, Inc. v. Conseco Med. Ins. Co.*, No. 6:03-CV-03211-RBH, 2006 WL 3423891, at *15 (D.S.C. Nov. 27, 2006) ("The cases where a fiduciary relationship has been found by S.C. courts all have a similar component. In each case, the fiduciary is in either a position *to advise* or act solely on behalf of the other party. For example, lawyers and accountants are in positions to advise." (emphasis added)); *Fort v. Suntrust Bank*, No. 7:13-CV-1883-BHH, 2016 WL 4492898, at *16 (D.S.C. Aug. 26, 2016), *aff'd sub nom.*

17

*In re Int'l Payment Grp., Inc.*, 733 F. App'x 98 (4th Cir. 2018) (granting summary judgment on breach of fiduciary duty claim where the record revealed no conduct by the defendant that "could be construed as advice and counsel"). However, Gugel has not cited any South Carolina case in which a financial advisor relationship of the type he had with Dixon was deemed to give rise to fiduciary duties (*see* ECF No. 26 at 13–15), and the Court would not presume to expand the imposition of fiduciary duties under state law. *See Consol. Insured Benefits, Inc.*, 2006 WL 3423891, at *15 ("As a federal court sitting in diversity, it is not this court's function to expand S.C. common law to impose a fiduciary duty on [the defendant] on the facts of this case when no S.C. court has previously recognized the existence of a fiduciary relationship on facts similar to this case."). Moreover, the SAC does not allege that Gugel had any foundation to believe that Dixon was acting solely in Gugel's interest, or that Gugel reposed special trust in Dixon, or that Dixon accepted any such confidence that was placed in him. Nonetheless, it is sufficient to assume without deciding the adequacy of the fiduciary allegations in this case because the legal sufficiency of the claim turns on whether Pacific Life knowingly participated in Dixon's purported breach of that duty.

In order to state a valid claim for aiding and abetting the breach of a fiduciary duty, the SAC must plausibly allege that Pacific Life knowingly participated in Dixon's breach. "The South Carolina Court of Appeals has interpreted 'knowing participation' as more than just mere tangential involvement, but actual encouragement or active procurement of the breach of fiduciary duty." *Simmons v. Danhauer & Assocs., LLC*, No. 8:08-CV-03819-JMC, 2010 WL 4238856, at *4 (D.S.C. Oct. 21, 2010), *aff'd*, 477 F. App'x 53 (4th Cir. 2012) (citing *Vortex Sports*, 662 S.E.2d at 449); *see also Fort*, 2016 WL 4492898, at

18

*17 (D.S.C. Aug. 25, 2016) (stating "knowing participation" requires more than "mere linked involvement" in a breach of fiduciary duty). In other words, knowing participation requires actual knowledge and assistance in the underlying breach. *See id.*

The SAC appears to suggest that the underlying fiduciary breach was Dixon's recommendation that Gugel participate in Shurwest's allegedly illegitimate IRA Reboot Program, utilizing an illegal structured cash flow product to fund the premium payments for his Policy. (*See* SAC ¶¶ 60–65, 127–28, 133–34.) However, other than conclusory recitation of the "knowing participation" requirement (*id.* ¶ 135), there are no factual allegations that Pacific Life had knowledge of, or that it *actually encouraged* or *actively procured*, Dixon's purported fiduciary breach in this regard. (*See id.* ¶¶ 81–118, 133–36.) In fact, the SAC expressly alleges that Shurwest agents, presumably including Dixon, "took measures to prevent insurance companies from knowing the true source of the funds Plaintiffs were using to pay their IUL policy premiums." (*Id.* ¶ 54; *see also id.* ¶ 128.e. ("Shurwest knowingly concealed the sources of funds that Plaintiffs were using to purchase and fund their IUL policies from the insurance companies that issued them.").) To the extent Gugel is alleging that Shurwest and/or Dixon's recommendation regarding the Policy was also a breach because it was inconsistent with Gugel's "specific financial situation[] and retirement goals" (SAC Introduction) and not in line with his "needs, risk profile and financial position nearing retirement" (*id.* ¶¶ 123.l.–n.), this theory also fails because the SAC expressly alleges that Shurwest and/or Dixon actively concealed such information from Pacific Life. (*Id.* ¶ 128.d. (alleging "Shurwest agents and employees knowingly altered and falsified information on insurance applications before submitting them to the insurance companies in order to evade certain underwriting procedures and

requirements").) In other words, Gugel's allegations regarding the underlying breach of fiduciary duty are inconsistent with the notion that Pacific Life "knowingly participated" in any such breach. *Fort*, 2016 WL 4492898, at *17 (stating that absent defendant's "*actual knowledge* of improper activity," defendant "cannot be found to have knowingly participated in [the fiduciary's] breach of fiduciary duty" (emphasis in original)). The SAC generally, and the aiding and abetting the breach of a fiduciary duty claim specifically, do not set forth a sufficient factual nexus between the alleged financial perils of the IRA Reboot Program promoted by Shurwest and Dixon on the one hand, and Pacific Life's independent development and marketing of the PDX IUL on the other. Because Plaintiffs have not plausibly shown that Pacific Life knowingly participated in a fiduciary breach, the SAC's third cause of action fails to state a claim and is hereby dismissed.

### B. Claim for Negligent Misrepresentation

In order to be legally sufficient, a claim for negligent misrepresentation requires a plaintiff to plausibly allege the following elements:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation.

*Quail Hill*, 692 S.E.2d at 508. The Court finds that Gugel's negligent misrepresentation claim against Pacific Life cannot satisfy these elements for two reasons.

First, the negligent misrepresentation claim is predicated on statements of opinion or statements concerning future events. To constitute an actionable misrepresentation, the false representation or omission must relate to an existing or pre-existing fact and

"cannot ordinarily be based on unfulfilled promises or statements as to future events." *Koontz v. Thomas*, 511 S.E.2d 407, 413 (S.C. Ct. App. 1999) (citation and quotation marks omitted). Thus, statements of opinion or predictions of future events cannot ordinarily form the basis of a negligent misrepresentation claim because they are not representations of existing fact, there is no right to rely on them, and they are not false when made.

The gravamen of Gugel's negligent misrepresentation claim is that Pacific Life employed a "sleight of hand" in the PDX Illustrations by failing to adequately disclose its use of the Performance Factor multiplier to amplify the illustrated potential future performance figures, thereby misleading customers into thinking that the aggressive account values shown in the Illustrations are based on the conservative illustrated crediting rate of 6.17%, while effectively concealing the fact that the PDX is a risky and highly leveraged product. (*See* SAC ¶¶ 81–103.) The Court notes that the Illustrations expressly state: "This illustration assumes non-guaranteed policy charges and non-guaranteed crediting rates." (ECF No. 22-3 at 3); "Non-guaranteed elements are not guaranteed." (*id. passim*); "**This is an illustration only. An illustration is not intended to predict actual performance. Interest rates, dividends, or values that are set forth in the illustration are not guaranteed, except for those items clearly labeled as guaranteed.**" (*id.* at 8 (emphasis in original)); "Values shown in this illustration are based on non-guaranteed policy charges and non-guaranteed crediting rates. Over time, the policy's actual non-guaranteed elements, and perhaps your actual use of the policy's options, are likely to vary from the assumptions used in this illustration. For these reasons, actual policy values will either be more or less favorable than shown in this illustration."

(*id.*). Because non-guaranteed values are, by their very terms, not guaranteed and not intended to predict actual performance, they are not actionable under a negligent misrepresentation theory. *See, e.g.*, *Krall v. Life Ins. Co. of Sw.*, No. SACV 09-1043 JVS, 2010 WL 11595829, at *2 (C.D. Cal. Mar. 3, 2010) (dismissing the plaintiff's negligent misrepresentation claim for failure to state a plausible claim).

In *Krall*, as here, the plaintiff predicated his negligent misrepresentation claim on alleged misrepresentations and non-disclosures that rendered the projected values in a life insurance policy illustration unreasonable and misleading. *Id.* The court in *Krall* repeatedly dismissed the complaint for failure to plead any actionable misrepresentation, finding:

> The illustration contains numerous warnings stating: "Benefits and values are not guaranteed. The assumptions on which they are based are subject to change by the insurer. Actual results may be more or less favorable." The illustration further warned that "[t]he historical performance of the S&P 500 Index should not be considered a representation of past or future performance . . . The future yield performance for either of these strategies may be less than or greater than the non-guaranteed assumed interest rates used in this illustration."

*Id.* (internal citations omitted, modifications in original). The court in *Krall* dismissed all claims premised on misrepresentations in the policy illustration because "the illustration's projections regarding future events are opinions and thus not actionable under a fraud or negligent misrepresentation theory as a matter of law," and "the illustration's examples regarding future returns cannot be considered promises, as they are explicitly and repeatedly deemed non-guaranteed." *Id.* Similarly, in the instant case, Pacific Life's conspicuous and repeated disclaimers that all non-guaranteed elements in the illustration were *not guaranteed* refute Gugel's theory that the numerical values of hypothetical future performance were unreasonable assumptions or knowingly false statements of actual

economic performance. (*See generally*, ECF No. 22-3.)

Second, Gugel does not plead, and cannot establish, justifiable reliance on the purported misrepresentations or omissions in the Illustrations. Even assuming Gugel *had* alleged an actionable misrepresentation or omission, his claim still fails because he does not sufficiently allege justifiable reliance. The SAC states that "[Gugel] justifiably relied on the false representations of Pacific Life." (SAC ¶ 155.) However, this formulaic recitation of the reliance element is insufficient as a matter of law. *See Truauto MC, LLC v. Textron Specialized Vehicles, Inc.*, No. 2:19-CV-1381-RMG, 2020 WL 438310, at *6 (D.S.C. Jan. 28, 2020) (dismissing negligent misrepresentation claim because justifiable reliance requires particularized facts that the plaintiff actually relied on an alleged misstatement); *see also Iqbal*, 556 U.S. at 681 (stating "bare assertions" that amount to nothing more than a "formulaic recitation of the elements" are insufficient to state a plausible claim for relief). The SAC includes no allegations that Gugel saw the Pacific Life materials during the sales process, let alone any specific allegation that he relied on anything contained in the Illustrations. Nor does the SAC include any allegations that Gugel ever discussed the Performance Factor with Dixon or Pacific Life (or any other Policy feature, for that matter), or that he otherwise relied on any representations or omissions regarding the Performance Factor, its operation, or associated costs. While the SAC contains an extensive discussion of the Performance Factor and its impact on the non-guaranteed illustrated values (*see* SAC ¶¶ 81–118), there are no allegations that Gugel was even aware of the Performance Factor, and no allegation that he relied on any representation regarding it in deciding to purchase the Policy.

However, even if the SAC alleged that Gugel saw and relied on the Performance

Factor and how it impacted the illustrated policy values, the claim would still fail because any reliance would not be justifiable as a matter of law. This is because the Illustrations include written disclosures that refute any claim of reliance. For example, and as already explained, the Illustrations include a "Narrative Summary," which discloses in bold font next to a heading labeled "Important Information" that: "This is an illustration only. An illustration is not intended to predict actual performance. Interest rates, dividends, or values that are set forth in the illustration are not guaranteed, except for those items clearly labeled as guaranteed." (ECF No. 22-3 at 8.) Similarly, with respect to the Performance Factor, the Illustrations provide that, while a Performance Factor greater than the guaranteed minimum Performance Factor will increase indexed interest "as reflected" in the Illustrations, it "is not guaranteed." (*Id.* at 16.) These disclosures make clear that the only values in the Illustrations that are guaranteed are those items clearly labeled guaranteed and that non-guaranteed values are "not intended to predict actual performance." (*Id.* at 8.) Accordingly, any reliance on the non-guaranteed values or projected performance in the Illustrations is not justified as a matter of law because the Illustrations expressly disclose that they are not guaranteed. See Regions Bank, 354 S.C. at 672-73, 582 S.E.2d 432, 445 (S.C. Ct. App. 2003) (holding, in the context of a fraud claim, that the plaintiff could not justifiably rely on alleged misrepresentations that were contradicted by the parties' contracting documents). Therefore, the Court finds that Gugel's negligent misrepresentation cause of action fails to state a plausible claim for relief against Pacific Life and the SAC's fifth cause of action is dismissed.

## CONCLUSION

For the reasons set forth above, Defendant Pacific Life Insurance Company's

("Pacific Life") motion to dismiss the second amended complaint (ECF No. 22) is GRANTED. There being no remaining Defendants to this action, it is hereby dismissed in its entirety.

**IT IS SO ORDERED.**

<u>/s/ Bruce Howe Hendricks</u>
United States District Judge

March 17, 2021
Charleston, South Carolina